IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>     v.<br><br>RODNEY WYATT,<br><br>              Defendant. | Criminal No. 12-64-CFC |

David C. Weiss, United States Attorney, Edmond Falgowski, Assistant United States Attorney, The United States Attorney's Office for the District of Delaware, Wilmington, Delaware.

*Counsel for Plaintiff*

Edson A. Bostic, Federal Public Defender, Janet Bateman, Assistant Federal Public Defender, Office of the Federal Public Defender District of Delaware, Wilmington, Delaware.

*Counsel for Defendant*

## MEMORANDUM OPINION

December 16, 2020
Wilmington, Delaware

_____
COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

Defendant Rodney Wyatt was sentenced on May 23, 2013 to 144 months incarceration for attempted possession of cocaine with intent to distribute and felon in possession of a firearm. Wyatt has filed a motion to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), contending that his obesity and hypertension in combination with the threat posed by the COVID-19 pandemic presents an extraordinary and compelling reason to grant the reduction. (D.I. 75) For the reasons stated below, the Court will deny Wyatt's motion.

## I. BACKGROUND

Wyatt is 39 years old. He was sentenced as a Career Offender under U.S.S.G § 4B1.1, as he had prior convictions for robbery second degree and possession with attempt to deliver drugs. The convictions that resulted in his current 144-month sentence arose out of DEA investigation that culminated in Wyatt's arrest on July 26, 2012, when Wyatt gave $40,000 in cash to undercover agents for 22 kilograms of cocaine. Agents found in Wyatt's home that same day two semi-automatic pistols and four boxes of ammunition. PSR ¶ 32. Wyatt's projected release date is October 30, 2022. (D.I. 77 at 2).

### A. Wyatt's Health

Wyatt contends that his obesity and hypertension warrant a reduced sentence. D.I. 75 at 2. Wyatt is 71 inches tall and weighs 242 lbs. D.I. 77 at 6 n. 7. Thus, Wyatt has a Body Mass Index (BMI) of 33. *Id.* The Centers for Disease Control and Prevention (CDC) subdivides obesity into three categories: Class 1 is a BMI of 30 to 34; Class 2 is a BMI of 35 to 39; and Class 3 is a BMI of 40 or greater, which is "sometimes categorized as 'extreme' or 'severe' obesity."[1] Wyatt's BMI of 33 puts him in the lowest category, Class 1.

Wyatt's medical records related to hypertension consist of a Health Screen Report and four Clinical Encounter reports. D.I. 78. A Bureau of Prisons' Health Screen Report dated January 7, 2020 states under the caption "Hypertension" that Wyatt had not been "taking medications for the last several weeks, thinks don't need medications." D.I. 78 at 1. Nevertheless, medication orders were renewed for Lisinopril and NIFEdipine for the treatment of hypertension. *Id.* at 4.

The first Clinical Encounter Report, dated January 14, 2020, has a chief complaint of hypertension. It reads, in relevant part:

> PATIENT MALE 39 YEAR OLD IN FOR CCC, HISTORY OF HYPERTENSION ON NIFEDIPINE (ON AND OFF). HE WAS ON HCTZ AND LISINOPRIL IN THE PAST (THE HCTZ WAS DISCONTINUED AND HE NEVER TOOK THE LISINOPRIL). DENIED ANY CHEST PAIN OR BREATHING PROBLEMS.

---

[1] https://www.cdc.gov/obesity/adult/defining.html.

D.I. 78 at 8. The report shows a new medication order for NIFEdipine. *Id.* at 9-10. But Lisinopril was discontinued because Wyatt was "non-compliant." *Id.* Finally, "EDUCATION [was] GIVEN ABOUT DIET, EXERCISE AND MEDICATION USE, HE UNDERSTOOD." *Id.* at 10.

The second Clinical Encounter Report, dated January 21, 2020, has a chief complaint of hypertension. It reads, in relevant part:

> PATIENT MALE 39 YEAR OLD IN FOR BLOOD PRESSURE EVALUATION. HE IS NOT TAKING HIS PROCARDIA (SINCE 6 DAYS AGO), BUT HE WILL STARTING TODAY. DENIED ANY CHEST PAIN AT THIS TIME.

D.I. 78 at 11. Procardia is the brand name for NIFEdipine. D.I. 77 at 14. Finally, "PATIENT EDUCATION [was] GIVEN ABOUT HYPERTENSION, DIET, EXERCISE, MEDICATION USE AND PLAN, HE UNDERSTOOD." D.I. 78 at 12.

The third Clinical Encounter Report, dated March 11, 2020, states, "Pt. here for sick call appointment requesting having his blood pressure checked. Pain: No." (D.I. 78 at 16). Blood pressure is recorded as 135/85 (*id.*), which the Government reports is stage 1 hypertension. D.I. 77 at 7 n. 11. Blood pressure measurements fall into four general categories: "normal," "elevated," "stage 1 hypertension," and "stage 2 hypertension."[2] The report further states, under the caption Pulmonary,

---

[2] https://www.cdc.gov/bloodpressure/facts.htm.

3

"Yes: Within Normal Limits. No: Respiratory Distress"; under the caption Cardiovascular, "Yes: Within Normal Limits"; and under the caption Patient Education Topics, "03/11/2020 – Counseling – Diet - Verbalizes Understanding." D.I. 78 at 17.

> The last Clinical Encounter Report, dated January 21, 2020, states:
>
> Received in health services for screening for flu-like s/sx due to possible exposure from confirmed positive. Denies sore throat, cough, body aches, fatigue, vomiting, headaches, diarrhea or subjective fever. Pain: No.
>
> * * *
>
> [F]lu vaccine offered at this time and inmate declined.

D.I. 78 at 19.

## B. COVID-19 and Facility Conditions

COVID-19 is a newly emergent infectious disease that as of March 11, 2020 was declared by the World Health Organization to be a pandemic.[3] The Center for Disease Control (CDC) divides the severity of illness from COVID-19 into three categories: "mild to moderate," "severe," and "critical."[4] Mild to moderate cases can include fever, cough, shortness of breath. *Id.* Severe cases include dyspnea

---

[3] https://www.who.int/news/item/29-06-2020-covidtimeline.

[4] https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html

4

and hypoxia. *Id.* Critical cases include respiratory failure and multiorgan system dysfunction. *Id.*

COVID-19 spreads "mainly through exposure to respiratory droplets when a person is in close contact with someone who has COVID-19."[5]

In January of 2020, the Bureau of Prisons (BOP) placed Wyatt at FCI Yazoo City Low in Missouri. The Government described several "significant measures" the BOP has taken to "mitigate sharply the risks of COVID-19 transmission in a BOP institution." (D.I. 77 at 2-4). As of this date, the BOP's Coronavirus information website shows that FCI Yazoo City Low has no inmates currently with COVID-19, five staff currently with COVID-19, three inmates who died from COVID-19, 84 inmates who have recovered from COVID-19, and nine staff members who have recovered from COVID-19. Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Dec. 16, 2020).

## II. DISCUSSION

In general, a district court cannot modify a term of imprisonment once it has been imposed unless a defendant is eligible for a reduction of sentence pursuant to 18 U.S.C. § 3582(c). *United States v. Mainor*, 725 F. App'x 85, 86 (3d Cir. 2018).

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

5

Section 3582 was amended in 2018 as part of the First Step Act.[6] Before the enactment of the First Step Act, only the Director of the Bureau of Prisons could file a motion seeking a sentence reduction. Now a motion may be filed by either the Director of the Bureau of Prisons or the defendant, except the defendant may not file a motion until "after [he or she] has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Here, Wyatt has filed the motion on his own behalf, and the Government does not dispute that Wyatt has met the exhaustion requirement. (D.I. 77 at 6 n. 6).

Although the First Step Act changed the process by which inmates can make a request for compassionate release, it did not alter the statutory standards that must be met for that request to be granted. The Sentencing Reform Act of 1984 established the statutory standard for granting compassionate release. A Court

---

[6] The First Step Act (P.L. 115-391) was signed into law on December 21, 2018. The act has three major components: (1) correctional reform via the establishment of a risk and needs assessment system at the Bureau of Prisons, (2) sentencing reform via changes to penalties for some federal offenses, and (3) the reauthorization of the Second Chance Act of 2007 (P.L. 110-199). https://fas.org/sgp/crs/misc/R45558.pdf. The amendment to § 3582 can be found in Title VI, which is titled "Miscellaneous Criminal Justice" provisions. https://uscode.house.gov/statutes/pl/115/391.pdf.

may reduce the term of imprisonment if it finds that "extraordinary and compelling reasons warrant such a reduction," and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Reform Act did not define what constitutes "extraordinary and compelling reasons," instead directing the Sentencing Commission to promulgate policy statements that do so. 28 U.S.C. §§ 994(a)(2)(C) and (t).

The policy statement of the Sentencing Commission that governs compassionate release can be found at U.S.S.G. § 1B1.13. Under that policy statement, a defendant is eligible for a sentence reduction if, after considering the factors set forth in 18 U.S.C. § 3553(a), the Court determines that three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement." U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018).

### A. Extraordinary and Compelling Reasons

U.S.S.G. § 1B1.13 was first issued in November 2006 and its "Application Notes" section has been amended substantively at least three times since then. The Application Notes contain four categories of extraordinary and compelling reasons:

7

"Medical Condition of the Defendant," "Age of the Defendant," "Family Circumstances," and "Other Reasons." U.S. Sentencing Guidelines Manual § 1B1.13 cmt. 1 (U.S. Sentencing Comm'n 2018).

Only the "Medical Condition of the Defendant" is potentially applicable here. The "Age of the Defendant" requires Wyatt to be at least 65 years old, which he is not. *Id.* at cmt. 1(B). "Family Circumstances" requires the death or incapacitation of either: (1) the caregiver of the defendant's minor children or (2) the defendant's spouse or registered partner, neither or which Wyatt alleges. *Id.* at cmt. 1(C). Finally, the catchall "Other Reasons" requires a determination by the Director of the Bureau of Prisons that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," the reasons already identified. *Id.* at cmt. 1(D). Because this motion was filed by Wyatt on his own behalf and not by the Bureau of Prisons, the Director has made no such determination, so the catchall provision does not apply here.

The Application Notes divide the "Medical Condition of the Defendant" into two subcategories: terminal illness and non-terminal illness. Specifically, they state that the medical condition of the defendant can constitute an extraordinary and compelling reason if:

> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic

8

>   solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia. [or]
>
>   (ii) The defendant is—
>
>   >   (I) suffering from a serious physical or medical condition,
>   >
>   >   (II) suffering from a serious functional or cognitive impairment, or
>   >
>   >   (III) experiencing deteriorating physical or mental health because of the aging process,
>
>   that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S. Sentencing Guidelines Manual § 1B1.13 cmt. 1(A) (U.S. Sentencing Comm'n 2018).

To understand the Application Notes, it helps to consider the reasons the Sentencing Commission gave for their last substantive amendment in 2016. Before 2016, the Application Notes required a "terminal illness" with no elaboration. Amend. 799 to U.S. Sentencing Guidelines Manual § 1B1.13. 1 (U.S. Sentencing Comm'n 2016), available at https://guidelines.ussc.gov/ac/799. Now, however, the Application Notes define "terminal illness" as "a serious and advanced illness with an end of life trajectory," and they explain that a probability of death within a specific time period "is not required." *See* U.S. Sentencing Guidelines Manual § 1B1.13 cmt. 1 (U.S. Sentencing Comm'n 2018). As the Sentencing Commission explained, these changes were made after reviewing the

9

Bureau of Prisons' internal criteria for implementing § 3582(c)(1)(A) and hearing testimony and public comment on the challenges associated with diagnosing terminal illness.[8] Specifically, the Sentencing Commission stated:

> [W]hile an end-of-life trajectory may be determined by medical professionals with some certainty, it is extremely difficult to determine death within a specific time period. For that reason, the Commission concluded that requiring a specified prognosis (such as the 18-month prognosis in the Bureau of Prisons' program statement) is unnecessarily restrictive both in terms of the administrative review and the scope of eligibility for compassionate release applications. For added clarity, the amendment also provides a non-exhaustive list of illnesses that may qualify as a terminal illness.

Amend. 799 to U.S. Sentencing Guidelines Manual § 1B1.13. 1 (U.S. Sentencing Comm'n 2016).

For non-terminal illnesses, the Sentencing Commission explained:

> [T]he amendment provides three broad criteria to include defendants who are (i) suffering from a serious condition, (ii) suffering from a serious functional or cognitive impairment, or (iii) experiencing deteriorating health because of the aging process, for whom the medical condition substantially diminishes the defendant's ability to provide self-care within a correctional facility and from which he or she is not expected to recover. The primary change to this category is the addition of prong (II) regarding a serious functional or cognitive impairment. This additional prong is intended to include a wide variety of permanent, serious impairments and disabilities,

---

[8] In the Sentencing Commission's February 17, 2016 Public Hearing on Compassionate Release, Dr. Brie Williams, Associate Professor of Medicine, Division of Geriatrics, University of California, San Francisco testified about the difficulty doctors have of predicting an exact time period until death for a terminal illness. *Public Hearing on Compassionate Release & Conditions of Supervision*, United States Sentencing Comm'n, at 154-162 (Feb. 17, 2016); Transcript available at https://www.ussc.gov/sites/default/files/Transcript_6.pdf.

> whether functional or cognitive, that make life in prison overly difficult for certain inmates.

Amend. 799 to U.S. Sentencing Guidelines Manual § 1B1.13. 1 (U.S. Sentencing Comm'n 2016).

In his motion, Wyatt does not claim that he is currently diagnosed with a terminal illness or a serious non-terminal illness that substantially diminishes his ability to provide self-care. Instead, Wyatt argues that his obesity and hypertension put him "at increased risk of severe illness should he contract COVID-19." (D.I. 75 at 2). Thus, the issue is whether Wyatt's hypertension and obesity in combination with the COVID-19 pandemic is an extraordinary and compelling reason that satisfies the Sentencing Commissions' Policy Statement.

As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Roeder*, 803 F. App'x 157 n.16 (3d Cir. 2020) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").

The Government does not dispute the relevance of COVID-19 to the resolution of Wyatt's motion. In the Government's view, it is appropriate to consider: (1) whether a defendant's underlying medical conditions increase his risk

11

of becoming "seriously ill from COVID-19," and (2) whether the defendant is more likely to contract COVID-19 is he is released compared to if he remains incarcerated. D.I. 77 at 12-13. This seems like a sensible way to apply § 1B1.13 to the unusual circumstances created by COVID-19.

The Court finds that Wyatt's obesity and hypertension fall short of showing a risk of becoming "seriously ill" from COVID-19. As an initial matter Wyatt is relatively young (he is 39).[9] He has presented no other risk factors except obesity and hypertension. Wyatt has a BMI of 33, which is on the lower end of the obesity BMI scale. The CDC reports that there is "consistent evidence" that obesity, defined as a BMI greater than 30 kg/m, "put[s] individuals at increased risk for severe illness from COVID-19."[10] At the same time, however, the CDC acknowledges that BMI is "a surrogate measure of body fatness because it is a measure of excess weight rather than excess body fat."[11] Because "BMI does not distinguish between excess fat, muscle, or bone mass" it provides an incomplete picture of a person's physical condition. *Id.* The CDC further reports that there is

---

[9] "[T]he risk of severe illness with COVID-19 increases with age, with older adults at highest risk." https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[10] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html

[11] https://www.cdc.gov/obesity/downloads/bmiforpactitioners.pdf

12

only "mixed evidence" that hypertension puts individuals at "increased risk for severe illness from COVID-19."[12] In addition, Wyatt's medical records demonstrate that he has not been compliant in taking his prescribed medications. It is reasonable to conclude that if Wyatt were compliant, his hypertension might be controlled.

As for the risk to Wyatt based on his location, the record indicates that Wyatt would not be at lower risk of contracting COVID-19 is he were released from FCI Yazoo City Low to his home in Laurel, Delaware. FCI Yazoo City Low has contained the virus, such that, as of December 16, 2020, no inmates and only five staff employees are currently infected with the virus. By comparison, Sussex County, which contains Wyatt's hometown of Laurel, has over 12,651 positive cases as of December 16, 2020,[13] and has been classified by Delaware Department of Health and Social Services (DHSS) as having "significant" community spread of COVID-19. *Id.* Finally, if released, Wyatt would live in a home with his wife who works full-time at Milford Memorial Hospital as a nursing assistant, and four children. The presence in that home of a front-line essential worker raises the risk of COVID-19 infection.

---

[12] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html

[13] https://myhealthycommunity.dhss.delaware.gov/locations/county-sussex/days_to_show/90/primary_trend_type/bar#overview_trends

13

For these reasons, the Court finds that Wyatt has not identified an extraordinary and compelling reason for a sentence reduction.

### B. A Danger to the Community

Even if Wyatt had demonstrated an extraordinary and compelling reason for release, the Court would deny his motion because he has failed to demonstrate that he is not a danger to the safety of the community or that he otherwise merits release under the § 3553(a) factors. Wyatt is a Guidelines Career Offender, with a robbery conviction and two felony drug convictions. On his last day as a free man, he was trying to buy 22 kilograms of cocaine and had in his home two semi-automatic pistols and four boxes of ammunition. The § 3553(a) factors strongly disfavor any sentence reduction. At sentencing, the Guidelines range was 188-235 months. PSR ¶ 127. The Court varied downward significantly to 144 months. That sentence must be served to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.

### III. CONCLUSION

For the foregoing reasons, the Court will deny Wyatt's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). D.I. 75.

The Court will issue an Order consistent with this Memorandum Opinion.